## In re INITIATIVE PETITIONS NOS. 112 to 118, Inclusive, STATE QUESTIONS NOS. 167 to 173, Inclusive.

Nos. 23082 to 23088, Inclusive. Opinion Filed Feb. 2, 1932.

Freeling & Box, Owen & Looney, and J. R. Keaton, for appellants.

A. Leon Hirsh and Baxter Taylor, for appellees.

William H. Murray and W. D. Humphrey, amici curiae.

RILEY, J. This court is confronted with a motion of protestant, S. P. Freeling, in these causes, whereby it is sought to dismiss these actions now pending in this court. The motion is resisted by Honorable Baxter Taylor and other attorneys appearing for petitioners (appellees) in oral argument. The grounds for dismissal are:

(1) That the cost of litigation, by way of payment of witness fees, is prohibitive.

(2) That on December 18, 1931, a purported election was held throughout this state on four of said initiated measures, and the election officials, having acted "under color" of official title and under an election proclamation at least valid on its face, are entitled to compensation for their services; that the amount so due is approximately $100,000.

(3) That Honorable Frank C. Carter, State Auditor, and the Attorney General of Oklahoma are agreeable to this view, and that if this motion is sustained, said money will be so paid out of the state treasury.

These causes are now pending in this court upon a contest of the sufficiency of the initiative petitions, and were so pending at the time of the purported submission of four of the measures of December 18, 1931. Pendency of the causes existed when on December 16, 1931, an ancillary action commenced by protestant for injunction against the State Auditor, to restrain him from paying out said funds, was decided by this court; wherein it was adjudged that if said State Auditor paid out said funds, he would do so at his peril and at the peril of his bondsmen. In re Initiative Petitions Nos. 112 et al., 153 Okla. 205, 6. P. (2d) 703. That ancillary judgment has become final.

This motion to dismiss should be sustained:

"According to the great weight of authority an appellant or plaintiff in error may dismiss his appeal or writ of error without regard to the consent of the appellee or defendant in error." 22 R. C. L. 144.

Dismissal, whether an original action or an appeal, is governed by the same general principle. It signifies the ending of a suit. 18 C. J. 1145. It is in fact a nonsuit.

While it is a true rule that a petitioner has no absolute right at all times and under all circumstances to dismiss (for such right is dependent upon the effect it has on the rights of the respondent, and in this regard the matter of dismissal rests within the discretion of the court), but, subject to the restrictions as affecting the movant's adversary, the movant cannot be compelled to prosecute the action against his will. How does this dismissal affect protestant's adversary? It gives him right for the first time to have proclaimed, with authority of law, announced by this court, that the initiative petitions have been finally accepted. But it may be said this is a matter publici juris, and for reason of the public good, the matter ought for all time to be settled. So it was, when funds of the taxpayers contained in the state treasury were involved,

and that issue was before this court. (There was pendency of that issue both before and after the purported election of December 18, 1931, for that decision did not become final under the rule of this court for 15 days.) Can it reasonably be said that this court should decline to act when the treasurer of the state is involved, and then act when only policies of the state government are involved? Certainly not. The highest degree of publici juris was at issue in the ancillary case where the public funds were involved. Policies of government smack of politics in the highest and lowest sense of the words. The time has now passed when the high duty to speak, if ever it existed, was upon this court.

The rule in reference to protestant's right of dismissal is:

"But ordinarily, he has the legal right, which in some cases is said to amount to an absolute right, to discontinue or dismiss his suit upon such terms and under such conditions as he sees fit, or upon such terms as the court may impose, and his reasons for so doing are of no concern to the court." 18 C. J. 1148. Valentine v. Valentine, 119 N. Y. S. 426.

Nebraska holds in Banks v. Uhy, 6 Neb. 145, that plaintiff is entitled to dismiss an action voluntarily without prejudice to another action, although his object in procuring dismissal is to proceed with another action involving the same subject-matter. Section 190, C. O. S. 1921.

"Under ordinary circumstances," says the text of Corpus Juris, "it is almost a matter of course to grant a dismissal or nonsuit before verdict, upon payment of costs." Veazie v. Wadleigh, 11 Pet. (U. S.) 55, 9 L. Ed. 630.

In New Hampshire Banking Co. v. Ball, 57 Kan. 812, 48 P. 137, it was held that the right to dismiss without prejudice before **final submission** is absolute and denial thereof is prejudicial error. Our statute on dismissal is identical with that of Kansas. There it was said:

"The plaintiff is entitled to control the disposition of its action, where the application is seasonably made, and until the final submission of the cause. It was a common-law right, and in this state the statute expressly provides that the plaintiff may dismiss without prejudice to a future action before the final submission of the case to the jury, or to the court, where the trial is by the court. Civil Code, sec. 397. Until that time the right is absolute, to be exercised by the plaintiff at its option, and without the consent of the defendants." Pugsley v. C., R. I. & P. Ry. Co., 69 Kan. 599, 77 P. 579.

Herein there has been no final submission, but the causes were set for hearing evidence when the motion to dismiss was filed.

"Final submission" is not present until all questions of law have been disposed of by the court, says the Kentucky Court, Doss v. Ill. Cen. R. Co., 198 Ky. 222, 249 S. W. 346.

"Final submission" means a submission which is equivalent of the return of the verdict, says the Montana court. Samuel v. Mont. H. Col. Co., 69 Mont. 111, 220 P. 1093.

Section 664, of our statute, provides:

"An action may be dismissed, without prejudice to a future action:

"First: By the plaintiff, before the final submission of the case to the jury, or to the court where the trial is by the court."

In Avery v. Jayhawker Gas Co., 101 Okla. 286, 225 P. 544, this statute was interpreted to mean what it plainly says. And in Naylor v. Eastman Nat. Bank, 107 Okla. 208, 232 P. 73, this court held that a "plaintiff may without leave of court dismiss before final submission to jury or rendition of judgment, by filing signed statement," by virtue of section 665, C. O. S. 1921.

In the last-cited case this court held that by virtue of section 665, C. O. S. 1921, a plaintiff "may without leave of court dismiss before the final submission to jury or rendition of judgment by filing signed statement," under the conditions provided, and that "section 665, C. O. S. 1921, grants unto a plaintiff a right of dismissal in addition to the right given him by section 664," the latter section being predicated upon the condition that dismissal is prior to "final submission," but the right of dismissal under section 665, supra, is conditioned upon being before the adversary "has filed a pleading in the action asking affirmative relief. He may in the absence of such pleading, therefore, do so (dismiss) until the case has been terminated by judgment of the court, if the same has not been finally submitted. * * *"

Such is the situation before this court, in the instant causes; there is no plea for affirmative relief by the adversary of protestant, there has been no final submission of the causes, and the causes have not (except as to the ancillary cause as against the State Auditor, and in that matter no affirmative relief by adversary was sought) been terminated by judgment of court. Moreover the protestant has filed his written and signed statement that he does so dismiss the causes. Therefore, by virtue of the rule of law recited in the Naylor Case, supra, "such dismissal is immediately effective without any order of dismissal being made by the court." Consequently this court is without power or authority to deny dismissal, "but can only acquiesce in dismissal," "upon such terms as the court may impose." 18 C. J. 1148; Davis v. Mimey, 60 Okla. 244, 159 P. 1112; Okla. Coal Co. v. Corrigan, 67 Okla. 90, 168 P. 1024; Stuart v. Hicks, 52 Okla. 665, 153 P. 143, and two early cases cited therein; Mullen v. Noah, 64 Okla. 181, 166 P. 742; Inter-State Crude Oil Co. v. Young, 29 Okla. 465, 118 P. 257; Long v. Bagwell, 38 Okla. 312, 133 P. 50; Kolp v. Parsons, 50 Okla. 372, 150 P. 1043; Brown et al. v. Massey, 19 Okla. 482, 92 P. 246; Oberlander et al. v. Confrey, 38 Kan. 462, 17 P. 88; McIntosh v. Lynch, 78 Okla. 85, 188 P. 1079.

What are proper terms that may be, in the discretion of the court, imposed? The first is that the court marshal the facts and recite the status of proceedings in the causes, warranting dismissal, for, it is by the Constitution, section 5, art. 7, provided:

"The Supreme Court shall render a written opinion in each case * * * after said case shall have been submitted for decision."

If the causes have not been finally "submitted for decision," it is what I conceive to be the performance of my duty to so say.

Another discretion of the court that may be imposed as a term or condition of dismissal is an analysis of the effect of dismissal upon the movant's adversary. And, since the movant's adversary ostensibly represents a great body of the citizenship of this state who are petitioners upon the initiative measures, and since protestant himself, as one citizen, is a remonstrator against the enactment into law of the initiative measures, this court may analyze and determine whether or not it is confronted with a matter publici juris. And if that determination is in the affirmative, declare the law as affecting the public as a condition to determination of movant's legal right of dismissal. "A thing is said so to be (publici juris) when it is common property." Cochran's Law Lexicon.

What is meant by a thing that is common property? It is when the thing involved belongs to the body of the citizenship. What is the thing involved? Primarily, it is the right of petitioners to have these proposed measures submitted to the electorate for enactment or rejection at the ballot box. That matter ultimately may concern both personal liberties as well as property rights.

Secondarily, the causes now considered did affect (in the ancillary proceeding) public property rights, in the expenditure of

public funds from the public treasury. That second matter was not decided, but reserved by this court for future determination. By this dismissal this court recognizes protestant's legal right to abandon the determination of all questions involved, and inclusive to that extent of his personal liberty and his property rights.

These questions could have been properly determined prior to the proposed election of December 18, 1931, as was done 90 years ago in the state of Rhode Island. Trial of Thomas Wilson Dorr, 2 Am. St. Trials, 5. However, this court having finally decided to abandon determination of the public property right involved in the ancillary case and to reserve for some future case the determination of that matter and in the meantime to place upon the State Auditor the responsibility for safety of public funds and the risk of payment therefrom of illegal claims, we may likewise as well, and more logically, trust to future determination the adjudication of the effect of the rejection at the polls of the measures submitted by executive orders pending litigation upon them and likewise the question of the duty of the Governor to make a proper submission of all these initiative measures.

Protestant pleads in paragraph 1 of his motion to dismiss that the cost of determination of these causes is prohibitive. It may be that he discovered the prohibitive cost of this litigation subsequent to the date first fixed for hearing herein. Surely he would not delay any man for lucre or malice. It may be that he sought in good faith, for good faith is presumed, by the exercise of his legal right, to counteract, what he assumed to be, the untimely haste of the Governor in submitting some of these measures, pending determination of final acceptance of the initiative petitions.. Even though the cost of continuing litigation may now seem prohibitive to protestant; even though he may now consider the benefit, to the public, to be derived from a determination, even in his favor, of the issues, of less importance than the cost of continued litigation, there is no necessity for assignments of reasons for his final act, for "his reasons for so doing (dismissing) are of no concern to the court." 18 C. J. 1148. Neither is protestant's conclusion, that certain election officials having acted "under color of official title and under a proclamation at least valid on its face, and that they are entitled to compensation"; nor the fact, if it be a fact, that both the State Auditor and the Attorney General "are agreeable to this view"; nor the fact "that if this motion is sustained the election officials will receive compensation for their ser-

vices," material, as a matter of law, to protestant's legal right of dismissal.

All men agree to the words of the Lowly Nazarene that "The laborer is worthy of his hire." If the state of Oklahoma, acting through its Governor in the manner provided by law, caused these various election officials to labor, they (all who labored or furnished necessary supplies) should be paid out of the appropriation made by the Legislature for that purpose. If Honorable William H. Murray, without legal authority, caused such labor, or caused such supplies to be furnished and used, he as an individual should pay the bill. If the debt is not so paid, it may be that some future Legislature will recognize that those who served and those who furnished supplies did so in furtherance of the recognized right of citizens to petition for redress of grievances or to remonstrate, that it should be treated as an obligation of the public, and make an appropriation out of which the claims may be lawfully paid.

There is another feature contained in paragraph 2 of protestant's motion which ought never, in my opinion, to go unchallenged by freemen. That is the statement that certain officials having acted "under color of official title and under an election proclamation at least valid on its face," the public money ought now be paid out. That statement of face validity of the executive order containing the proclamation for election of December 18th, last, was challenged by written opinion and denied in the ancillary cause by Justices Swindall, Andrews, and myself, and we were supported by the vote of Justice Cullison. The majority opinion did not support nor sustain the facial nor resultant validity of the said election proclamation, nor did protestant's brief or argument herein, prior to his about face, subsequent to the election, sustain the same.

That proclamation was in the face of this protest and appeal, it recited by its text the pendency of this litigation and in plain words defied any court to interfere with that so-called election. Therein also the sabre was rattled and the army of the state was paraded, in words.

Mr. Pound aptly says:

"Courts cannot be made the tame cats either of the executive or the legislative power except as they themselves yearn for a warm place by the fire. If the judges, 'the inheritors of great traditions,' have seemed at times, abruptly or by imperceptible degrees, to abdicate some measure of their functions, the fault, if it is a fault, rests not on the phraseology of a particular Constitution, but rather on the construction

which the final interpreters of the law have put on the ordinary constitutional rights of person and property. In their cautious reluctance to push such rights to a stubbornly literal conclusion in the interests of an extreme individualism the courts have frequently demonstrated that they are not automata, playing the game with mere mechanical skill and accuracy. Independent judgment as an organ of the judicial mind is not wholly atrophied, however reluctant its possessors are at times to exercise it." Harvard Law Review, vol. 35, pp. 795-6.

Even the extraordinary assumption of power in the issuance of orders in council of the British Crown was based on an act of a subservient Parliament. In the proclamation not even the words of the ipsi dixit of the Governor support the remarkable document.

When executive act preceded the law, or determination of what the law is (when determination is involved in court as in these causes), we are afforded an example of tyranny.

William Pitt expressed it in another dimension when he said:

"Where the law ends Tyranny begins."

It will be remembered that when free governments superseded the hereditary sovereignties of Greece, all who obtained absolute power in a state were called tyrants, for the term regards the irregular way in which the power was gained, whether by force or fraud as well as the manner of the exercise of the power. Webster's Int. Dict.

Should we recognize this power to rule by executive orders in one case, we should in all. The acts and deeds of this court are declaratory of the permanent rule of law. It must be so, for, as Edmund Burke pointed out:

"The vice of ancient democracies, and one of the causes of their ruin: that they ruled by occasional decrees, which broke in upon the tenor and consistency of their laws."

Consequently, should this court recognize the superseding of a pending determination of law by an executive order proclaiming the law, there is no telling the consequences. In its inception it is an executive despotism and the result is beyond our conception of government. Opposition to despotic government is so engrafted in the Anglo-Saxon mind that it cannot be countenanced as a rule over such people.

Authority leads to love of power. The recorded struggle to hold within limits of law the power granted is the history of the English people. That struggle began within 50 years after the Conquest. What is probably the oldest constitutional document in English history—a writ in the reign of John (1204)—establishes that then there was a higher authority than that of even the King, and it was his council of advisors (Report on the Dignity of a peer of the Realm, vol. 1, p. 54). In a Medieval Year Book an authority over even a King was recognized:

"The law is the highest inheritance which the King has, for if there were no law, there would be no King, and no inheritance."

Burke recognized limitations upon the power of King George III, when, in speaking upon the Excise Bill to levy tax upon the American Colonies, he said:

"The poorest man in his cottage may bid defiance to all the forces of the Crown; it may be frail, its roof may shake, the storm and rain may enter, but the King of England may not enter."

It may have been that King George had before him the example of his cousin, Frederick the Great, in his object of making all of his ministers dependent on him (Enc. Brit. 4-827) rather than constituting them members of a party acting together in pursuance of a common policy. Howbeit, as viscount Morley remarks: Not everyone can draw the bow of Ulysses. Moreover, the English people cannot long endure a government possessed of the spirit of the bayonet.

The people of Oklahoma have indicated on at least two occasions their ineptitude for the Spirit of Martial Law.

This court should not be blind to that which every citizen knows, nor to the recorded argument adduced in the hearing of these causes, all of which indicates that this proclamation was "power, usurped" and its enforcement was accomplished by the rattle of the sabre. Need I defend myself for so saying after recitation of these facts? Is not the statement axiomatic?

The Supreme Court of the United States in the year 1874, speaking through Mr. Justice Miller, in the cause of Savings & Loan Association v. Topeka, 22 L. Ed. 461, used equally as strong language, in discussing the abuse of power in the action of a co-ordinate (legislative) branch of government. It was said: It "is none the less a robbery because it is done under the forms of law. * * * This is not legislation. It is a decree under legislative forms. (Emphasis mine.)

The Governor is bound by the law, as enacted by the people and as interpreted by their courts.

"Whether God or the people be regarded as ruler (source of power) their authority must be exercised by some intermediate persons, either priests or magistrates. These latter belong personally to the class of subjects, and they exercise only delegated authority as the servants of God or of the people. They cannot, therefore, be regarded as real rulers, who are unable to act in person. They are constantly forced to refer to a superior power (the law), which itself rules them, and which confers upon them an authority that they do not possess in themselves." (The Theory of the State, p. 340— Oxford 1892.)

Before a Governor by executive order or proclamation can properly prescribe and enforce any act upon the body of the people of this state, he must have specific authority of law. A proclamation is simply defined as a crying out of the law. I do not wish to be understood as acquiescing in a statement that this proclamation is valid on its face; nor to be understood as assenting to the proposition that public funds, contained in this appropriation, may be legally paid out upon the assumption that this proclamation is the law.

The reasons set up by protestant in his motion to dismiss may appeal strongly to his conscience and impel him to exercise his legal right of dismissal. On the other hand, there are good reasons why he should not dismiss, for not having put his hand to the plow and called into motion the machinery of this court for the determination of the question of the legality or sufficiency of the initiative petitions, and the legality of a submission pending litigation of that question, and the determination of the legality of expenditures of public funds involved, he should not now turn back and leave these vital public questions undetermined.

I am loath to consent to dismissal of these causes while these questions are undetermined, thus leaving the State Auditor, if he "should authorize the paying out of any funds, * * *" subject to an action to determine "whether or not the Auditor and his bondsmen are liable," but, recognizing the legal right to dismiss at this stage of the proceedings, in accordance with my views heretofore expressed in my dissenting opinion in Julian v. Capshaw, 145 Okla. 237, 292 P. 841, I must assent to the dismissal.

This court adheres to the rule of law announced by it in Re Initiative Petition No. 23, State Question No. 38, 35 Okla. 49, 127 P. 862, decided October 8, 1912.

These causes are, therefore, dismissed, subject, as provided by section 6631, C. O. S. 1921, "to be revived within five days by any other citizen." The clerk of this court will

retransmit all papers and documents heretofore transmitted by the Secretary of State to the clerk of this court, to the Secretary of State for his appropriate action.

CULLISON and ANDREWS, JJ., concur.

SWINDALL, J. I concur in the syllabus and the rules of law announced in the opinion.

HEFNER, J. I concur in the rules of law announced in the syllabus.

McNEILL, J. I concur in the result that grants the protestant the right to dismiss, but dissent to the reasoning and conclusions stated in the opinion.

LESTER, C. J., CLARK, V. C. J., and KORNEGAY, J., dissent.

LESTER, C. J. (dissenting). The protests in these cases should be dismissed on the grounds that said protests are wholly insufficient and do not allege any fact sufficient to constitute an issue thereon.

Owing to the fact that this court has heretofore, in my judgment, misconceived the construction to be placed on section 6631, C. O. S. 1921, I desire to state my views thereon.

In order to fully present my analysis herein it is necessary to recite certain provisions of our State Constitution so that we may come to a better understanding of the statute under which the appeal is taken. The makers of our Constitution provided the fullest measure whereby the people of this state were to be recognized as the final source of power and authority, for in section 1 of the Bill of Rights, it is stated:

"All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided, such change be not repugnant to the Constitution of the United States."

Section 1 of article 5 of the Constitution provides:

"The legislative authority of the state shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."

Section 3, art. 5, of the Constitution provides in part:

"Petitions for the initiative and the referendum shall be filed with the Secretary of

State and addressed to the Governor of the state, who shall submit the same to the people."

Section 2 of article 5 provides:

"The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and 15 per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so proposed. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety) either by petition signed by five per centum of the legal voters or by the Legislature as other bills are enacted. The ratio and per centum of legal voters hereinbefore stated shall be based upon the total number of votes cast at the last general election for the state office receiving the highest number of votes at such election."

Section 3 of article 5 provides that the Legislature shall make suitable measure for carrying into effect the provisions of this article, which refers, of course, to both initiative and referendum petitions.

In my judgment the Legislature clearly used the word "suitable" advisedly to the end that legislation should be enacted to effectuate rather than to destroy the rights reserved by the people under the power of initiative and referendum, for we find the word "suitable" to be defined: "Capable of suiting; fit or adapted for a specified purpose; applicable; appropriate." New Standard Dictionary, Funk and Wagnalls.

Indeed the Legislature, compatible with the power reserved by the people, did enact legislation for the purpose of safeguarding and protecting the procedure that was to be followed.

In this case we are dealing with initiative petitions only. In section 6625, C. O. S. 1921, a form for initiative petitions is set forth, also other provisions of procedure which should be substantially followed.

Section 6626, C. O. S. 1921, defines and sets forth the requirements of initiative petitions in the following language:

"Each initiative petition and each referendum petition shall be duplicated for the securing of signatures, and each sheet for signatures shall be attached to a copy of the petition. Each copy of the petition and sheet for signatures is hereinafter termed a pamphlet. On the outer page of each pamphlet shall be printed the word 'Warning,' and underneath this, in ten-point type, the words, 'It is a felony for anyone to sign an initiative or referendum petition with any name other than his own, or knowingly to sign his name more than once for the measure, or to sign such petition when he is not a legal voter.' Not more than 20 signatures on one sheet shall be counted."

Thus it is seen that it is a felony for any one to sign an initiative or referendum petition under any other name than his own, or knowingly to sign their name on a petition more than once or to sign such petition when one is not a legal voter. Penalties are provided in order to protect the sanctity of such petition.

Section 6631, C. O. S. 1921, is the only section of the statute upon which an appeal upon the sufficiency of a petition may be had.

It is my purpose to show that section 6631, supra, when read carefully, is easily understood. As I interpret that section, it means that when an initiative petition conforms in substance to the requirements of the statutes, and shows on its face that the required percentage of legal voters, with their post office addresses, have signed said petition and that said signatures together with their post office addresses are given and that said signers thereof are legal voters and that the circulator then signs and makes an oath as to the correctness of his statements before an officer authorized to administer oaths, then, in my judgment, the petition is sufficient to be submitted to the officer clothed with power to call an election. In the instant case the particular question that the Secretary of State was to decide after hearing on the protest presented to him is to be found in section 6631, supra. For it is there provided and pointed out he is limited to one finding, to wit: "After such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes." If it is sufficient on its face, the Secretary should so hold. If not, he should so hold. I emphasize the statement that the Secretary of the State is confined to the question as to whether the form of the petition is substantially as set out by section 6625, supra. The form means whether or not the petition on its face shows that the required number of legal voters with their post office addresses has been signed to the said petition; as to whether or not the circulator has made oath that said signers are legal voters and their post office addresses given are correct; and that said circulator must then sign said oath and the jurat of the officer administering the oath must be attached to the affidavit. If all the requirements are met and shown on the face of the petition, it is then established as a provisional procedure. Of itself it creates no law or enactment, it is

simply used as a procedure for the purpose of inaugurating an election thereon.

Section 610, C. O. S. provides:

"An affidavit may be used to verify a pleading, to prove the service of a summons, notice or other process in an action, to obtain a provisional remedy, an examination of a witness, a stay of proceedings, or upon a motion, or in any other case permitted by law."

If the affidavit of the circulator establishes nothing, why require it?

Again returning to section 6631, supra, it states that after such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes, and his decision shall be subject to appeal to the Supreme Court of the state.

The appeal is taken from the question that was submitted for decision to the Secretary of the State with all the limitations thereon. The scope of inquiry cannot be broadened by an appeal.

Before we reach the next provision of section 6631, supra, we state that it is therein shown that it is the spirit and intent of the statute that a speedy hearing be had thereon, for it is therein stated:

"If the court be at the time adjourned, the Chief Justice shall immediately convene the same for such hearing."

We know of no other provision of the statutes of this state so imperative in nature so far as they relate to a speedy determination of a cause. By reason of this statute it is intended that the court shall without delay pass upon the sufficiency of a petition as shown upon its face.

It is further provided that such court shall give such cause precedence over all others.

It occurs to the writer that if it were permissible to go behind the genuineness of the names shown on the petitions, consisting in this case of several hundred thousand names, the immediate assembly of the court would prove of little value.

Section 6631, supra, further interprets the character of judgment that the court may render if the petition is insufficient, for therein it is said:

"If the court shall adjudge such petition insufficient, the parties responsible for same shall have the right to correct or amend their petition to conform to the opinion of the court, provided said amendment or change is made within five days."

Here the Legislature had in mind that the court on appeal should deal only with the form and face of the petition, and if corrections such as could be made in the form and face of the petition, such corrections were permissible. In other words, it was only in these matters that could be corrected on reversal and which appear on the face of the petition that the court was permitted jurisdiction over on appeal. We here inquire how and in what manner could the court cause an amendment to be made that would cure forgeries that appeared on the face of the petition? How and in what manner would the court order an amendment be made to a petition signed by illegal voters? How and in what manner could a circulator who did not know whether or not certain signatures were by legal voters be cured by an amendment?

The court under the appeal statute can only ascertain whether or not there are sufficient number of names appearing on the face of the petition; whether or not the circulator has verified by affidavits the correctness of said names and the signatures thereto of the legal voters with their post office addresses.

Neither the Secretary of the State nor the court is permitted to go behind the signatures as they appear upon the face of the petition unless by such appearance upon the face of the petition it shows plainly that certain signatures are forgeries.

If we accept the theory that an issue may be made upon the genuineness of the several thousand names by reason of forgeries or that the signers on said petition are not legal voters or that the circulator who swore did not personally know that the signers thereof were legal voters, we will then go into the issues that may prolong the trial before the Secretary of State for weeks, months, or a long term of years, depending largely upon the resourcefulness of counsel; and after that officer has made a decision the protestant may file an appeal therefrom, lodge the same in this court, and this court again go over the long route of investigation that may extend into a duration of time lasting for weeks, months, or even years. Certainly, if this theory is accepted, an issue of fact may be formed upon each of the several thousand names attached to the petitions and many witnesses may be called upon to testify relating to each individual signer. Not only may hundreds of witnesses be called, but they may be increased to thousands, thereby delaying the petition for possibly years.

If issues of this character may be raised and the protestant permitted to go behind the face of the petition, we may just as well strike from our Constitution the privilege

of the initiative and referendum, for judicial procedure would render them impotent.

If by legal procedure we may hamper, strangle, and paralyze by trial the provisional procedure of the initiative and referendum, the electors who propose legislation by initiative route will be practically forever arrested by legal processes of this court. It is true that in some former opinions the court has passed upon the sufficiency of initiative petitions, but I find no case where the sufficiency of a protest was attacked, nor do I find a definite interpretation of section 6631, supra, as here pointed out.

It clearly appears to me that the appeal statute, requiring with emphasis that on appeal the Supreme Court must immediately convene and give precedence over all other matters, is to be construed to the end that neither procedure nor the trial thereof shall be long delayed.

Not only did the Legislature in section 6631 provide:

"After such hearing the Secretary of State shall decide whether such petition be in form as required by the statutes"

—but the Legislature again reaffirmed this principle, for in Session Laws 1919, chapter 161, it is provided:

"The charter so ratified may be amended, revoked or abolished by proposals therefor submitted by the legislative authority of said city to the qualified electors thereof to be voted for at any general or special election or said proposals to amend, revoke or abolish such charter may be submitted by a petition signed by a number of qualified electors residing within the corporate limits of such city equal to 25 per centum of the total number of votes at the last general or special election held in such municipality, and the proceedings shall be construed liberally in favor of the petitioners. Upon the filing of a petition, signed by the required number of electors, qualified to vote in the proposed election, as the same appears on the face of the petition." Sec. 2.

In my judgment any law passed by the Legislature that would permit an investigation or procedure to be drawn out before the Secretary of State upon questions of fact for several years, and then upon decision made by the Secretary of State, then an appeal may be had to this court and here drawn out for several years, that such proceeding would be wholly unconstitutional, for in that it would not be suitable to legislation compatible with the provisions of the Constitution relating to initiative and referendum reserved by the people. This court should not for a moment tolerate any such interpretation, for it would permit issues to be formed that would destroy by delay the right of those seeking under a petition sufficient on its face to carry measures to an election by the people.

Not only do we accept in court provisional measures upon their face, but they are accepted in commercial and professional affairs of life. Titles to real property amounting to millions are transferred upon the face or signatures to deeds duly acknowledged before proper officer. Abstractors compile abstracts concerning property in value that reach into millions of dollars; abstracts upon which lawyers deliver their opinion upon titles. These are accepted from records. These records are made up from instruments signed by the purported owners of real estate, and if on the face of the record it is shown to be regular and the instrument acknowledged before officers authorized to accept acknowledgments, the legal profession recommends the acceptance of titles on the face of the record.

The petition itself neither creates nor establishes a law. It seeks only to invoke proper procedure for the calling of an election.

The office of an affidavit may be used to set in motion judicial process of our court and thereby obtain provisional remedies. In this case, where thousands of electors, whose signatures and legality as voters have been established by affidavits, should they be denied their right of petition by judicial interpretation? I cannot so agree. It may be urged that it would be shocking to hold that the protestants could not attack forgery upon an initiated petition. If such forgery exists in any form, the circulator of such petitions is guilty of felony and the state can find its redress by the due punishment thereof; but, on the other hand, if by judicial interpretation the courts can arrest the rights of electors by action of protestant and permit a trial to be had which would delay an election for years upon a petition which appeared in due form, such protestant commits a political wrong in which no redress may be had, and I cannot yield to any such doctrine in the face of a statute that is plain, unambiguous, a statute whose mandate requires of this court a speedy determination of one issue. Only one question is set out by the statute for determination, as follows: "Whether such petition is in form as required by the statute." That question is first submitted to the Secretary of State, and from his decision the same question is again submitted to this court with its limitations.

The requirement of the statutes is that the vital facts necessary to a sufficient peti-

tion be set forth, and the violation thereof is made a felony under the law, and the state may find its redress in the punishment of those guilty of violating the act relating to the initiative and referendum. On the other hand, if we hold that a protestant may go behind a petition regular in its form, that part of the citizenry of the state that is given the constitutional right to petition has no redress.

In the record of the proceedings had before this court on the 28th day of November, 1931, in this case, as shown by page 44 of the transcript, a short colloquy took place which is substantially as follows:

"Chief Justice: On that proposition I can surmise an action that might be filed that would seek to strike every name signed upon the petition as being forgeries, and the taking of testimony on each name where this occurs that would run into years in taking of testimony. Protestant: Yes, sir. Chief Justice: * * * And it could run into ten or twelve years of investigation on one petition, therefore, practically destroy the effect of the statute. Protestant: I realize that, and I realize the force of the suggestion of the Chief Justice."

Under the allegations of the protestant permitted by the court over the objections of the respondent, it would likely take months and possibly years in taking testimony in attempting to support the allegations of the protestant, and, therefore, the procedure under the interpretation given by the majority of this court is wholly unsuitable to the constitutional provisions relating to initiative and referendum. However, the climax is shown by the motion of the protestant to dismiss said cause and shows the unworkable proceedings of attempting to prove the allegations of the protestant.

The writer has at all times contended herein that if issues could be formed that would cause the taking of testimony on the genuineness of the signatures of several hundred thousand names the cost thereof would be prohibitive and the duration of time required to hear such evidence would in effect strike down the opportunity to furnish to the people an opportunity to pass upon questions under the initiative and referendum.

The protestant in this case, when confronted with the task of proving the allegations, finds that it is impossible to do so on account of the prohibitive cost therein, and on the 11th day of January, 1932, in a motion to dismiss said cause stated and alleged in paragraph 1 of said motion:

"That. to try said cases on their merits would cause an expenditure of many thousands of dollars in paying the expenses of witnesses from every section of Oklahoma, which expense would be so great as to be prohibitive."

Here it is shown that the protestant surrenders by reason of the weight of his own allegations set forth in his protest. He created the issues through his pleadings. His pleadings were sustained by a majority of the court over the protest of the respondent, and finally the protestant by his own motion admits that he is overwhelmed by virtue of this undertaking and moved to dismiss said cause.

The writer has contended that this would be the ultimate result of every case wherein it was permitted for the protestant to go behind the face of the petition. For to permit a trial on alleged forgeries not shown on the face of the petition would involve cost that would be prohibitive and a duration of time that would defeat the submission of proposed measures.

The Secretary of State is confined, under section 6631, supra, to but one question and that is whether said petition be in form as required by statute, and that his decision shall be subject to appeal to. the Supreme Court of the state. Of course, on appeal to this court the same question is submitted for decision. The procedure on a contest that is either prohibitive in cost of determining the same or duration of time that might lengthen into years was never contemplated either by the Constitution of this state or the Legislature, but such is its effect under the holdings of a majority of this court.

I dissent from the opinion of the court herein for the reason that the protestant in his motion to dismiss said cause did not complain of any injurious act by any other department of the state government and the opinion herein is not justified by an attempt upon the part of the court to scold another department of the government.

It was never intended that the allegations of a protest should be so burdensome that none would be able to pay the cost of attempting to support said allegations or the defense thereto be so burdensome that none would be able to pay the cost of defending against the allegations.

The proceeding on appeal permitted by this court when followed to its practical analysis creates such a burden on a protestant and respondent that renders the case impossible of trial.

The judicial department of the state should and must be free to act fearlessly on any issue properly before it without any inter-

ference of any kind from any other department of the state, but it should await with judicial calmness issues of law that may be presented to it and at no time become a controversialist merely for the purpose of expressing its views on current issues of general interest.

The judicial department of the government will always receive the respect due it when it confines its jurisdiction and judgments to the issues before it for decision.

It is not necessary that it ever become jealous or controversial with other departments of the state government. When it acts within these limitations its judgments will be received with respect and approval.

This court, having heretofore erroneously made Frank Carter, State Auditor, a party to these proceedings, should by an opinion in this case dispose of the question as to whether or not the election officials who held the election on the 18th day of December, 1931, are entitled to payment.

CLARK, V. C. J. (dissenting). The questions presented in this cause were deemed by this court to be of sufficient importance to occupy its time continuously from the 25th of November, 1931, until the 16th day of December, 1931; during which time all members of the court, with few exceptions, were in attendance. It was of sufficient importance that several hearings were had and the court spent many days in conference to determine the issues involved and the questions presented.

The first issue presented to the court was a protest against the initiative petitions brought to this court by appeal from the Secretary of State by the Honorable S. P. Freeling, protestant. The question raised by this protest, which the majority of this court deemed sufficient, which protest was believed by a minority of this court, including the writer of this opinion, as insufficient to put in issue the validity of the petition filed with the Secretary of State.

The seven initiative petitions involved herein were filed with the Secretary of State, October 31, 1931.

Initiative Petition No. 112 was a proposed statutory law, the number of signatures on the petition was 121,401. The number necessary to call an election on this measure was 40,913. The signatures in excess of the number necessary to call an election was 80,488.

Initiative Petition No. 115 was a proposed statutory law. The number of signatures on the petition was 120,661. The number necessary to call an election on this measure was 40,913. The signatures in excess of the number necessary to call an election was 79,748.

Initiative Petition No. 116 was a proposed statutory law. The number of signatures on the petition was 120,992. The number necessary to call an election on this measure was 40,913. The signatures in excess of the number necessary to call an election was 80,079.

Initiative Petition No. 117 was a proposed statutory law. The number of signatures on the petition was 121,187. The number necessary to call an election on this measure was 40,913. The signatures in excess of the number necessary to call an election was 80,274.

Initiative Petition No. 113 was a proposed constitutional amendment. The number of signatures on the petition was 119,916. The number necessary to call an election on this measure was 76,713. The signatures in excess of the number necessary to call an election was 43,203.

Initiative Petition No. 114 was a proposed constitutional amendment. The number of signatures on the petition was 120,257. The number necessary to call an election on this measure was 76,713. The signatures in excess of the number necessary to call an election was 43,554.

Initiative Petition No. 118 was a proposed constitutional amendment. The number of signatures on the petition was 120,263. The number necessary to call an election on this measure was 76,713. The signatures in excess of the number necessary to call an election was 43,550.

It can be seen from the face of the petitions that on four of these initiative petitions there must be found more than 75,000 invalid signatures before the same could be declared invalid. On the three constitutional questions there must be more than 43,000 invalid signatures before this court would be authorized to declare the petition invalid or insufficient.

I am of the opinion that no one connected with this case and familiar with the facts above set out ever believed for a moment that there was any likelihood or possibility of the protestant presenting to this court any evidence of the invalidity of the great number of signatures necessary to invalidate the petitions in question, and it will be shown herein later the protestant admitted without offering a witness that the petitions were valid. The administration of justice is a practical affair and should be administered with the use of common sense in dealing with the affairs of mankind and not by strained or technical constructions, which are not justified by the law or the facts. However, since the protestant abandoned

the protest, admitting thereby that he has taken up the time of this court for purposes other than trying of the issues involved and thereby convicting this court or a majority of the members thereof of taking up its time that belonged to the people of this state, which should be devoted to determining the legal question before it for determination, in discussing and in considering a matter which was not sufficiently pleaded in the protest and which the protestant did not offer to prove by the offering of a single witness.

For this reason, I am of the opinion that this court should hold that a protest that does not state facts, but only mere conclusions, based on belief, is invalid and insufficient to raise any issue. This court from time to time continued this matter upon the application of protestant, without any showing of diligence on the part of the protestant in procuring witnesses, without any showing that if witnesses had been procured there would be any testimony material to the issues joined, and thereby permitted protestant to take up the time of this court and continue said hearing over the protest of respondent indefinitely and thereby deprive respondent of his constitutional right and depriving the citizenship of Oklahoma, who are vitally interested in the determination of these matters, of their right to have this matter speedily determined, which was contemplated by the Constitution of Oklahoma and directed by the statutes of this state.

On the 25th of November, 1931, R. A. Sneed, Secretary of State, certified to the Governor of the state of Oklahoma the finding that each initiative petition had sufficient signatures to submit the same to a vote of the people. The protestant appealed to this court.

On December 4, 1931, the Governor of the state of Oklahoma called an election submitting to the people of the state of Oklahoma, for their rejection or approval at the polls, Initiative Petitions Nos. 112, 114, 117, and 118.

Thereafter, on December 7, 1931, protestant, S. P. Freeling, filed in this court an application asking that the State Election Board be made parties to this action and that Frank C. Carter, State Auditor, be made a party to this proceeding, and prayed that an injunction be granted enjoining the State Election Board from holding an election called by the Governor of the state of Oklahoma, on the ground that the call was invalid, and prayed that the State Auditor be made a party and be enjoined from issuing warrants or paying expenses of said election on the ground that the Governor was unauthorized to issue a proclamation calling an election on December 4th, for the reason the matter was then pending before this court on appeal from the Secretary of State; and this court by its appropriate order made Frank C. Carter and the State Election Board parties to this action, but later amended said order and released the said election board and retained only the State Auditor, Frank C. Carter, as a party to this cause. The prayer of this petition was that this court determine that the election called by the Governor be invalid; that the expenses of the election could not be lawfully paid.

This court upon application assumed jurisdiction to determine said matter. An opinion was prepared and filed in this cause which denied the injunction requested and failed to pass on the other questions raised. And this case stands now before this court with Frank C. Carter a party to said action, made so by an order of a majority of this court.

On January 11, 1932, S. P. Freeling, protestant, filed his motion to dismiss said cause, which should be adjudged as an abandonment of said protest.

Frank C. Carter, a party to this action, filed his answer on December 10, 1931, in which he asks affirmative relief of this court, which is as follows:

"Wherefore, premises considered, this defendant submits this his answer and prays the court for such an adjudication of the issues involved herein as will enable him to properly perform the duties of his office in the auditing and allowing of claims which may be filed against the appropriation above mentioned."

The majority opinion filed herein does not dispose of any of the questions presented.

I am of the opinion that on the four initiative petitions seeking to enact laws in which there were more than 75,000 signatures more than necessary to submit the same to the people, this court should enter its judgment that said petitions are sufficient, and on the three petitions for proposed constitutional amendments, which contained more than 43,000 signatures more than necessary to submit the same, that this court should enter its order and judgment finding the same sufficient in law and to conform to the Constitution and laws of this state to submit the same to the voters of the state of Oklahoma, in the manner provided by the Constitution and the laws of the state of Oklahoma.

The majority opinion does not decide this

question. The question raised on the application that made Frank C. Carter a party to this action, who has filed his answer herein, raised the question of the proclamation of the Governor calling an election on four of these measures. This question should be decided, not evaded, as the rights of the people of the state of Oklahoma are involved.

I am of the opinion that the proclamation of the Governor calling said election was valid and that said measures were properly submitted to a vote of the people at the time the same were submitted.

Section 1 of article 5 of the Constitution of Oklahoma reserved to the people the right to propose laws by initiative and referendum.

Section 2 of article 5 of the Constitution of Oklahoma provides that 8 per cent. of the legal voters have a right to submit a legislative matter and that 15 per centum of legal voters have a right to propose constitutional amendments.

Section 3 of article 5 of the Constitution of Oklahoma provides in part as follows:

"Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State and addressed to the Governor of the state, who shall submit the same to the people. The Legislature shall make suitable provisions for carrying into effect the provisions of this article."

The right of the Governor to submit these questions to the people is granted by the Constitution when it appears that 8 per cent. on legislative matters and 15 per cent. on constitutional matters of the voters have signed the petitions and the same are filed with the Secretary of State and addressed to the Governor. Neither the Legislature, the courts, nor any other authority, civil or military, has authority to prevent, hinder, or delay the Governor in calling the election when there are sufficient signatures filed with the Secretary of State, which under the Constitution authorizes the Governor to call an election.

The four measures which were presented to the people for their rejection or approval by the Governor had many more valid signatures than were necessary to authorize the Governor, under the Constitution, to call the election on said measures.

The call having been authorized under the Constitution by the filing with the Secretary of State the initiative petitions with sufficient signatures thereon, then, under the Constitution, it was the duty of the Governor to call the election. The authority to call the election being by the Constitution placed in the Governor of the state of Oklahoma, it cannot be limited or denied by the Legislature or the courts.

The Constitution having vested in the Governor sole authority to call the election and submit the initiative matters to the people, and the initiative petitions having contained sufficient and valid signatures, under the Constitution, to authorize the Governor to call the election, the call was valid. The right to appeal to the Supreme Court of Oklahoma from the finding of the Secretary of State is a statutory right and said appeal is governed solely by the statute; and the only question to be determined by the court was, Were sufficient valid signatures attached to the petition to authorize the calling of the election? The statute does not provide a supersedeas, nor was there any application made to this court to supersede the finding of the Secretary of State that the petition so filed contained sufficient valid signatures to authorize the calling of the election.

The Supreme Court of Oregon held that an appeal did not suspend the operation of the referendum in the case of State ex rel. Carson, Dist. Atty., v. Hoss, 292 Pac. 324.

In the case at bar the law of Oklahoma grants no stay in the proceedings pending in appeal to this court. In Oklahoma the powers of government flow from the people, and the people of Oklahoma, after vesting legislative authority in the House and the Senate, reserved to themselves the power to propose laws and the power to enact or reject them at the polls. This reserve power reserved to the people by their Constitution, if it could be limited by the Legislature or superseded by order of the court, then this power would not be absolute, but would be a conditional power subject to the act of the Legislature or to the action of the courts of this state.

It is true the Constitution does not prohibit the Supreme Court of Oklahoma from determining matters of purely judicial nature, but all the power and jurisdiction the Supreme Court of Oklahoma has is given it by the Constitution of Oklahoma and no legislative power nor power to control legislation, in its discretion or the people acting in a legislative capacity, was granted to the Supreme Court to interfere with the Legislature or in any way control the right of the people to act in a legislative capacity.

The Supreme Court of Oklahoma is without power or jurisdiction to call an election on an initiative petition or to prevent the people from voting at an election called on any proposed measures.

In my opinion, the proclamation of the Governor calling this election was a valid proclamation, and his act was constitutional, not only authorized by the Constitution but commanded by the Constitution. The assumption of authority by the courts not granted by the Constitution is usurpation of power and should not be indulged in by the courts of this state.

I am of the opinion that this court should hold that the election was regularly and properly called and that the men who rendered services as election officials should be paid for said service in the manner provided by law for such pay. This is one of the questions presented in the case at bar which the majority opinion reserved for future consideration. It should be decided by this court for the reason by vote of the majority of members of this court it was made an issue in this cause, and having made it an issue and many people becoming vitally interested in the result, said issue should be determined and this court should determine it one way or the other that the many election officials in this state, and the people who have claims for services rendered, and the State Auditor, who was made a party in this cause, can know their rights.

It should be determined because if each election official in the state of Oklahoma must bring a separate action to determine his legal rights in this matter as to whether or not he is entitled to compensation for his services, it would require a multiplicity of suits and the expenses would be too great and the litigation continued over a number of years, which would not only take the time of the litigants but the time of the courts of this state, when this matter could and should be settled by an appropriate decision of this court at this time.

I am of the opinion that this court should settle the question of the legality and force and effect of the Governor's call on the four measures submitted for the reason said action will arise again to be presented to this court in another form and require the time of this court to determine said matter and leave the matter of vital interest to more than 100,000 citizens of this state as to their rights under the Constitution and laws of this state undetermined, when the citizens through their representatives have appeared before this court and requested that said matters be determined.

Even though should this court determine that the measures submitted were not submitted as authorized by the Constitution and laws of this state (which I do not agree is correct), then that determination would not make the election invalid, but would make the result of the election invalid. The results of an election being invalid does not affect the right of the election officials to compensation for holding the election and performing the election duties prescribed by the statute that said election officials shall perform in holding elections in this state. Can it be said that an election official, when called upon by his duly authorized superiors to appear in a precinct and hold an election, must know in advance before an election— that he must determine for himself that the results of that election would be legal before he could be compelled to serve or before he would be entitled to compensation for holding that election? Such a rule of law, to my mind, would require each election official, before he performed the statutory duties enjoined upon him by the statute and Constitution of this state, to determine whether or not the results of the election would be legal and valid before he could act without danger of being denied compensation for services so rendered.

Could a juror be denied compensation for his services for the reason the jury failed to agree on a verdict and reached no legal result, or that the trial court did not have jurisdiction of the cause tried by the jury? Could a sheriff be denied compensation in his effort to capture a criminal for the reason he failed to capture the criminal, or could it be said that a sheriff could be denied compensation for his services rendered in capturing a man who upon a subsequent trial was acquitted? The election official was called to perform a duty, that duty was prescribed by the statutes of this state, the compensation allowed is fixed by the statute of this state; and to say that he was not entitled to his compensation for services rendered in performing his duty enjoined upon him by statute and a compensation fixed for performing that duty by statute, in my opinion, is a most unreasonable construction of a statute, and I believe this court should hold and determine and so say by an opinion that the election officials who held the election on December 18, 1931, are entitled to compensation for the services so rendered.

The majority opinion states on page 258, that this court adjudged, if said State Auditor paid out state funds, that he would do so at his peril and at the peril of his bondsmen. I do not agree that this court so adjudged said matter, for the reason that it was not an adjudication of any question before this court. The only thing determined in that case was that the application for injunction should be denied. The question of peril of

the State Auditor and his bondsmen was not determined and was not an issue before the court, for the reason the State Auditor in his answer had asked this court for an adjudication of the issues involved as will enable him to properly perform the duties of his office, and the State Auditor is entitled to such an adjudication.

Having failed by the majority opinion to determine the validity of the initiative measures presented to this court for determination; having failed to determine the right of the State Auditor to pay the claim of election officials, and having failed to determine whether or not the proclamation of the Governor calling the election was valid or invalid, and these being the only questions before this court for proper determination, the opinion prepared and filed in this case can serve no purpose unless it can be said that the acts of the Chief Executive in this state recounted and criticized in the opinion are a proper matter for judicial determination in this court.

The Chief Executive of this state heads a co-ordinate branch of this government, co-equal in power and authority in the executive department of this government and co-equal in power and authority with the Supreme Court in the judicial department of this government, and co-equal in power and authority with the Legislature in the legislative department of this government, and this court is not authorized or empowered by the Constitution or the laws of this state to control the executive department of the government; and it is not proper that this court should burden the files of this court with criticism of the Governor of this state by placing said criticism in an opinion of this court to be made a part of the public records of this court and filed in the archives of this court.

I must refrain from copying the language used. This court, in the case of Hoover v. State, 73 Okla. 112, 175 P. 117, in the 2nd paragraph of the syllabus, said:

"A brief in no case can be used as a vehicle for the conveyance of hatred, contempt, insult, disrespect, or professional discourtesy of any nature for the court of review, trial judge, or opposing counsel. The language objected to here in the brief of plaintiff in error is offensive, impertinent, insulting, unwarranted, and unjustified, and as a brief this court cannot recognize it, and it is our duty to protect the files of this court from becoming the permanent receptacle of such a document."

This cause was cited with approval in Erwin et al. v. Harris, 124 Okla. 225, 254 P. 718, and it was said in the body of the opinion at page 225 of the Oklahoma Report:

"Such statements are as foolish as they are mischievous. Counsel has need of learning the ethics of his profession anew, if he believes that vituperation and scurrilous insinuation are useful to him or his client in presenting his case."

In the case of Pancoast, Adm'r, et al. v. Eldridge, 127 Okla. 146, 259 P. 863 this court quoted with approval from Hoover v. State, supra, as follows:

"A brief in no case can be used as a vehicle for the conveyance of hatred, contempt, insult, disrespect, or professional discourtesy of any nature for the court of review, the trial judge, or opposing counsel."

The criticism of the Chief Executive contained in the majority opinion is unnecessary for the determination of the issues before this court, and this court having held that a brief that is used as a vehicle for the conveyance of hatred, contempt, insult, disrespect, or professional discourtesy of any nature should be stricken as not proper, to burden the files of this court with briefs expressing disrespect or professional discourtesy.

Under the cases cited, I am of the opinion that the criticism contained in the majority opinion of the Governor of this state is unwarranted and can serve no useful purpose in the determination of the issues involved in this cause and should not be made a part of the permanent files of this court. This court has a constitutional and legal right and it is its duty to determine if the act of the Chief Executive in calling the election was invalid, to say so, or if it was valid, to say so, but to refuse to pass on these questions and then fill the opinion with criticism, in my opinion, is not warranted by the record in this case.

There is a growing tendency among some of the citizens of this country of ours to override all authority that seeks to confine their activities within the bounds of the law until we are confronted in some of our major cities with gang warfare, with robberies, murders, and gang kidnapping, reoccurring daily; and the highest court in this state should not encourage those who would overthrow all legal restraint by criticism of public officials whose sworn duty it is to enforce the laws of our state and to uphold the Constitution and protect the rights of its citizens.